## DANIEL et al. v. ELK REFINING CO.
### Civ. A. No. 1120.

United States District Court
S. D. West Virginia, Charleston Division.
Feb. 9, 1952.

Bailey, Worrell & Bailey, R. D. Bailey, Sr., and R. D. Bailey, Jr., all of Pineville, W. Va., for plaintiffs.

Dayton, Campbell & Love, Ernest H. Gilbert, Jr., and Thomas W. Moses, all of Charleston, W. Va., for defendant.

MOORE, Chief Judge.

Plaintiffs bring this action for the purpose of obtaining the rescission of a lease made by plaintiffs to defendant, and covering a lot of land situate in Pineville, West Virginia, since improved by defendant by building a gasoline service station thereon, which station has been operated for nearly three years.

The lot in Pineville is owned jointly by plaintiffs. Emma J. Daniel also owns a lot in Oceana, West Virginia, which is a small town about 14 miles from Pineville, and in the same county. Defendant wished to procure a lease on the Pineville lot for the purpose of erecting thereon a gasoline service station. Its representative, George B. Chambers, went to see plaintiffs about leasing the Pineville lot. At the time, Emma J. Daniel was engaged in conducting a general store, which was located on still another lot which she owned in Oceana adjoining the other, and was living there, while F. L. Daniel was staying at Alderson, West Virginia.

Chambers agreed with F. L. Daniel on the terms of a lease of the Pineville lot, and this lease was signed in Beckley, West Virginia, by F. L. Daniel. At the time he signed and delivered to Chambers the lease on the Pineville lot, F. L. Daniel stated to Chambers that the lease would have to be satisfactory to his wife, or words to that effect. Chambers made no inducement to obtain F. L. Daniel's signature to the lease, other than the considerations set out in the lease itself.

Chambers took the lease on the Pineville lot, already signed by F. L. Daniel, to Emma J. Daniel for the purpose of procuring her signature thereto. He had already visited her store on several occasions to talk about the leases, and on each occasion she had given him to understand that she would agree to lease both the lot in Pineville and the lot in Oceana, but not the Pineville lot separately. The lease on the Pineville lot, as proposed and as afterwards executed, provided for a monthly rental of $75, the lot being worth, unimproved, approximately $12,000. The proposed lease on the Oceana lot, which was never executed, would have provided for a monthly rental of $50, the lot being valued at approximately $1,250, unimproved. Both were to be for a term of ten years, and at the end of that time the improvements were to belong to the lessors.

During the negotiations between Chambers and Emma J. Daniel, Chambers at one time suggested to her that she go with him to Charleston and see a filling station there which the Elk Refining Company had built, telling her that this was the type of building they intended to put on the Oceana lot, and that it was a better station than the one they were building, or had built on the Daniel lot at Pineville. This circumstance (the superiority of the proposed building at Oceana), together with an understanding that plaintiffs' son was to manage the Pineville station, was a part of the negotiations whereby the rental of the Pineville lot was fixed at $75 a month, and that of the Oceana lot at $50 per month. It does not appear from the evidence whether the parties considered the marked difference in valuation between the two lots in fixing the respective rentals.

At the time Chambers came to see Emma J. Daniel with the lease on the Pineville lot, already executed by her husband, defendant had already partly completed the building on that lot. She again told him that she would not execute the Pineville lease unless the company also leased the Oceana lot. He told her at that time that the company would lease the Oceana lot and would erect a filling station on it and would pay a rental of $50 a month for the lot, with provision that the improvements made by the company would belong to the lessor at the end of ten years. When she asked Chambers why the lease on the Oceana lot should not be executed then and

900

there he said to. her in effect that the company had gone ahead with the improvements on the Pineville lot without a lease, and that she could trust the company to follow the same procedure with reference to the Oceana lot.

On the faith of Chambers' promise and his statements which led up to and accompanied it, Emma J. Daniel signed and delivered to Chambers the lease for the Pineville lot.

All through these transactions and for some weeks or months thereafter, Chambers and his superior officers in the Elk Refining Company, had under consideration the idea of leasing Emma J. Daniel's Oceana lot on the terms already mentioned, for use as a gasoline service station. However, there was no definite intention on the part of Chambers or any officer of the company with reference to the leasing of the Oceana lot at the time the lease on the Pineville lot was delivered to Chambers by Mrs. Daniel. Defendant did not lease the Oceana lot, but on the contrary, about seven months later, it leased from a third party, for operation as a gasoline service station, another lot in Oceana, about 1000 feet distant from Emma J. Daniel's lot.

■ I find from all the evidence in the case that Chambers' promise to Mrs. Daniel that defendant would lease her Oceana lot on the terms specified in their negotiations, together with the other statements made by him as above related, were made for the purpose of obtaining her signature to the lease on the Pineville lot, and as an inducement to her to sign that lease; also that she relied on Chambers' promise and his other statements, and that she would not have signed the Pineville lease if they had not been made; and further, that Chambers' promise, in the light of all the surrounding circumstances and his other statements, amounted to a representation to Mrs. Daniel that defendant had decided to lease the Oceana lot, when Chambers knew that such was not the case.

At the close of the hearing I made the following findings of fact, which I now reiterate and adhere to:

"1. That F. L. Daniel and Emma J. Daniel were the joint owners of Lot No. 33 in Pineville, and that Emma J. Daniel was the owner of Lot No. 1 in Oceana.

"2. That at the time F. L. Daniel signed the lease to the Elk Refining Company for Lot No. 33 in Pineville, he stated to Mr. Chambers, agent for the Elk Refining Company, that the lease would have to be satisfactory to his wife, or words to that effect.

"3. That no promise or inducement was made or undertaken to secure F. L. Daniel's signature to the lease.

"4. That Chambers did promise, as an inducement to obtain the signature of Emma J. Daniel to the lease on the Pineville lot, that the company would lease Lot No. 1 in Oceana and erect a filling station on it and pay a rental of $50.00 a month, and that that promise did induce Emma J. Daniel to sign the lease on the Pineville lot, and that without that inducement she would not have signed it.

"5. That there was no definite intention on the part of Chambers at the time, as distinguished from merely having the lot under consideration, that it would be leased from Emma J. Daniel." (This last finding of fact was amplified by the further finding that both Chambers and the company expected to keep and did keep the Oceana lot under consideration for some time as a possible location, and that the evidence in the case does not justify a finding that Chambers, at the time he made the promise to Mrs. Daniel, had an intention not to lease the Oceana lot.)

The legal questions to be decided are: First, whether Chambers' promise that defendant would lease the Oceana lot, in the light of his other statements and the surrounding circumstances, amounted to fraud; secondly, if the promise was fraudulent, does it follow that F. L. Daniel's execution and delivery of the lease on the Pineville lot should be cancelled or rescinded because of failure in the performance of a condition precedent, or should the rescission be limited to Emma J. Daniel's interest in the Pineville lot; and lastly, in either case, what relief, if any, should be granted.

■ My conclusion is that there was fraud on the part of Chambers, and that both plaintiffs are entitled to rescission of

the lease. It is clear that Chambers wished Mrs. Daniel to believe that Elk Refining Company had definitely decided to lease the Oceana lot. This is shown, not merely by his bare promise that such a lease would be made, but more clearly by his collateral statements. A promise made under such circumstances, when the promissor does not at the time intend that the promise shall be kept, is in effect a false representation with respect to an existing fact. Martin v. South Bluefield Land Co., 1917, 81 W.Va. 62, 94 S.E. 493; Davis v. Alford, 1932, 113 W.Va. 30, 166 S.E. 701; Cottrell v. Nurnberger, 1948, 131 W.Va. 391, 47 S.E.2d 454, 5 A.L.R.2d 1298. Thus, in Davis v. Alford the Supreme Court of Appeals of West Virginia, in sustaining a verdict for a plaintiff who challenged the validity of a deed conveying real estate on the ground that its execution was secured by a fraudulent promise, said [113 W.Va. 30, 166 S.E. 702]: "The defense that the contention of the plaintiff is nothing more nor less than an assertion of a promise by the defendant to convey real estate, and therefore void as within the statute of frauds, is not well taken. What the plaintiff relies upon is not the breach of a verbal promise to convey (or cause to be conveyed) real estate, but the deceiving of plaintiff by a false promise made to him by the defendant, *without intention of performance* by him, for the fraudulent purpose of putting him in an advantageous position at the expense of the plaintiff, and acted upon by the plaintiff to his detriment." (Emphasis added.)

It is argued that the elements of false representation are not present in Chambers' promise, because at the time he made the promise he did not intend that it should *not* be performed, but on the contrary, that Chambers and his employer, Elk Refining Company, actually had the Oceana lot under consideration at the time, and continued to consider it as a possible location for some time thereafter. In my opinion, that circumstance does not purge the transaction of the fraud which was inherent in Chambers' statements. Obviously, from the testimony in this case, Mrs. Daniel would not have signed the lease of the Pineville lot had she known the actual intention of Chambers and his company, namely; that they merely looked with some favor on the site and would consider it and decide later whether or not they would lease the Oceana lot. That was not what she was holding out for, and Chambers knew that it was not. His intention, therefore, was to deceive her, and he succeeded in doing so. Fraud may be predicated upon failure to perform a promise, where the promise itself is the device used to accomplish the fraud. Davis v. Alford, supra.

As to F. L. Daniel's interest in the Pineville lot, I think his statement to Chambers when he delivered the lease, signed and executed by him, to the effect that it would have to be satisfactory to his wife, attached a condition precedent to the lease; that such condition precedent, properly construed, meant that Emma J. Daniel must be willing to execute the lease according to its terms before it should become effective; and that the lease was not effective when the condition precedent was not fulfilled. The fact that Emma J. Daniel signed and delivered the lease of the Pineville lot to Chambers would have fulfilled the condition in the absence of any fraud in that transaction; but since the lease, as to Emma J. Daniel, is rescindable for fraud practiced on her in its inception, the situation is as though the lease, signed and acknowledged by F. L. Daniel, were still dependent on the condition that it be made satisfactory to his wife, which, of course, has not been done. See IX Wigmore, Evidence § 2410.

In decreeing a rescission of the lease of the lot in Pineville, it must be borne in mind that defendant has placed valuable improvements on the lot, with the expectation of using these improvements during the term of the lease, namely, ten years, after which time title to the improvements would vest in the lessors. It would not be equitable to rescind the lease and permit the lessors to take immediate title to and possession of the lot and the improvements without restoring to defendant a just and proportionate part of the cost of erecting the improvements.

The general rule is thus stated in 24 Am.Jur., Fraud and Deceit, § 196: "* * * (I)t is generally held that be-

902

fore an equitable action to obtain rescission of a contract tainted by fraud can be successfully prosecuted to completion and obtaining of relief, any money, property, or rights of action received thereunder should be restored. * * * The well-known equitable maxim that 'he who seeks equity must do equity' has been stated in many cases to be the basis of the principle."

Defendant has had the use of the improvements for approximately three years. Its expectation and intention was to have their use for ten years. Therefore, it seems equitable to require plaintiffs, as a condition of their obtaining rescission of the lease, to pay to defendant that proportion of the total cost of the improvements which the unexpired term of the lease bears to its stated term of ten years. If this figure cannot be stipulated between the parties, further evidence will be taken to ascertain the proper amount.

Plaintiffs will be granted the relief prayed for, conditioned as above set forth.